### ARNOLD-CREAGER CO. v. BARKWILL BRICK CO. et al.

(Circuit Court of Appeals, Sixth Circuit. November 6, 1917.)

#### No. 2953.

1. PATENTS ⟨key⟩328—VALIDITY AND INFRINGEMENT—BRICK MACHINE.
    The Arnold patent, No. 787,019, for a brick machine, claim 2, as limited by its terms, *held* not infringed. Claim 8 *held* void for lack of invention, in view of the prior art.

2. PATENTS ⟨key⟩165—CONSTRUCTION—VOLUNTARY LIMITATION OF CLAIMS.
    The intentional limitation of a claim by the patentee is binding on him, although the limitation was voluntary.

3. PATENTS ⟨key⟩178—DOCTRINE OF EQUIVALENTS.
    When a word of limitation in a claim in a patent for a machine is not a matter of mere form, as describing a particular machine, but represents a thought essential to that which the inventor regarded as his new step, its limiting effect cannot be neutralized through the rule of equivalents.

Appeal from the District Court of the United States for the Northern District of Ohio; John H. Clarke, Judge.

Suit by the Arnold-Creager Company against the Barkwill Brick

Company and the Wellington Machine Company. Decree for defendants, and complainant appeals. Affirmed.

Edw. R. Alexander and M. B. & H. H. Johnson, all of Cleveland, Ohio, for appellant.

H. E. Smith, J. B. Hull, and Hull, Smith, Brock & West, all of Cleveland, Ohio, for appellees.

Before KNAPPEN and DENISON, Circuit Judges, and McCALL, District Judge.

KNAPPEN, Circuit Judge. Suit for infringement of the Arnold patent, No. 787, 019, April 11, 1905. The invention relates to the type of "horizontal soft mud" brick machines, consisting generally of a pug mill by which the clay is—by means of knives and propellers carried by a "horizontal pug shaft" extending longitudinally through the mill—cut, mixed, and advanced into a charging or pressing chamber at the front end of the mill, where by means of a vertically reciprocating inside press it is forced into molds, which are then mechanically delivered from the machine. The claims involved are No. 2, which relates solely to mechanism for operating the press platen, and No. 8, which is confined to a provision for admitting air between the press platen and the clay. The present Mr. Justice Clarke, who presided below, held claim 2 not infringed, and claim 8 void for anticipation, and dismissed the bill. The appeal is from the decree of dismissal.

[1] Turning to claim 2, which we print in the margin:[1] When Arnold applied for his patent (September 23, 1904) the situation, so far as here important, was this: In 1900 Horton had obtained a patent on a press "located wholly inside of the chamber of the pug mill." He operated his press by means of a crank mounted on the pug shaft on the front end of the mill, through a vertically disposed pitman attached at its lower end to the crank and at its upper end, by a ball and socket joint, to a walking beam extending longitudinally above the mill, and to which the press platen stems were adjustably secured. Horton was marketing and manufacturing machines under his patent. Paradine, who claimed to have invented the Horton device, was manufacturing a machine called the "20th Century," which differed from Horton's, so far as important here, in that it used in place of a walking beam a rocker arm shaft which carried the press platen stems. In 1902 Arnold contracted with Paradine for the right to manufacture the latter's 20th Century machine on a specified royalty. An interference between Paradine and Horton was decided in 1903 in the latter's favor, but the plaintiff company continued for many years later to pay

[1] "2. In a brick machine employing a horizontal pug mill and shaft, a charging chamber and a press platen, the mechanism for operating the press platen, consisting of a crank mounted on the front end of the pug mill, a vertically moving plunger journaled in ways mounted on the frame, a stud shaft connected to said plunger and projecting outwardly above the crank pin, and a pitman connecting said stud and crank, a second stud shaft mounted on said plunger and projecting inwardly over the charging chamber, a rod rigidly connected to the platen and journaled on said inwardly projected stud shaft, substantially as described."

royalty to Paradine on all machines made by the company, although marked with and marketed under its own name after the Arnold patent issued.

Early in 1904 Horton sued Arnold's company for infringement; the suit was settled the following January by consent to decree sustaining the Horton patent, but without liability for past or future use of the alleged infringing machines. One of the defenses here made to claim 2 of the Arnold patent is that Paradine was, if not the sole inventor, at least a joint inventor with Arnold. We agree with Judge Clarke that upon the testimony there is grave doubt whether Arnold was the sole inventor of the subject-matter of that claim; but this question was not decided by Judge Clarke, whose opportunities in that regard were better than ours. We find it unnecessary to decide it, and for the purposes of this opinion we shall treat the invention as Arnold's.

Arnold's advance over Horton and Paradine was merely the substitution (for the walking beam of the one and the rocker shaft of the other) of the "plunger" running between ways on the outside of the chamber, interposed between and directly connected with the press platen stem and the upper end of the pitman—the "plunger," when the machine was assembled, being practically a part of the stem. The connections of both Horton and Paradine between the crank and press mechanism were direct in a proper sense, and Arnold in his testimony seems to so treat them. The latter merely showed a more direct method than that of his predecessors; and, given the interposed sliding "plunger," the outside guides followed naturally enough, in view of the then existing art. But Arnold's connection being more simple and direct, and effecting a positive movement of the press platen, resulting in greater speed and smoothness of operation—with less wear and tear and wobbling, less breakage and greater output (evidenced by public favor and by the alleged infringement)—had decided utility, and we think disclosed invention. From a mechanical standpoint, however, the advance in the art was slight.

The differences between the invention disclosed by claim 2 and the alleged infringing machine manufactured by the defendant Wellington Company for, and used by, defendant Barkwill Company, are these:

The machine disclosed by the specification is of the front delivery type, that is to say, the bricks are delivered from the *front end* of the pressing chamber, and thus of the mill, by a movement longitudinally of the mill; the plunger, sliding between ways on the outside of the front end of the charging chamber, is connected on its rearward, or inward, side by an inwardly projecting stud shaft to a yoke to which are attached rods supporting the press platen, and on the front or outward side by an outwardly projecting stud shaft to the pitman (near, but not at, its upper end), whose lower end is connected to a crank journaled directly upon the pug shaft. Defendant's machine is of the side delivery type; that is to say, the bricks are delivered from the side of the pressing chamber by a movement at right angles to the side of the mill. The plunger slides between ways located outwardly on the delivery *side* of the pressing chamber, and is connected on its rearward or inner side by a pin to the yoke carrying the rod support-

ing the press platen, and on the front or outer side by a pivot pin to the upper end of the pitman, whose lower end is connected with a double crank, carried not by the pug shaft (as it could not be), but by a countershaft (operated by gearing at the rear end of the pug shaft) lying parallel with the pug shaft and entirely outside of the pugging chamber. Defendant's pivot pins, connecting the pitman to plunger and crank respectively, are not unnaturally parallel with the face of the plunger, while those of the patent are at right angles thereto.

It is apparent that claim 2 does not read literally upon defendant's structure; for it seems plain that by "the front end of the pug mill" is meant the front end of the mill taken as a whole, at the front end of which is the charging chamber. Such is the natural meaning of the language used; and reference to the specification leaves in our minds no doubt that such was the meaning intended. Arnold manifestly had no idea of applying his press mechanism to anything but a front delivery machine, and it apparently did not occur to him that it was otherwise applicable. Horton was his chief competitor, and his improvement was made only in an effort to get the benefit of Horton's device through Paradine and to improve upon the latter. The claim is, broadly speaking, the measure of the patentee's rights, and is not infringed unless construed as broadly as if it read substantially:

"In a brick machine, employing a horizontal pug mill, a shaft, a charging chamber and a press platen, the mechanism for operating the press platen consisting of a crank mounted on a shaft on the outside of the pug mill, a vertically moving plunger, journaled in ways mounted on the frame and inwardly connected operatively with the press platen rod and outwardly connected pivotally with the upper end of a pitman whose lower end is pivotally connected with the crank."

[2] Assuming that defendant's device would infringe the claim in the absence of express limitation therein, yet, if the inventor has intentionally so limited it, he is bound by that limitation, notwithstanding it was voluntarily made (McClain v. Ortmayer, 141 U. S. 419, 425, 12 Sup. Ct. 76, 35 L. Ed. 800; Cimiotti Co. v. American Co., 198 U. S. 399, 415, 25 Sup. Ct. 697, 49 L. Ed. 1100; Ohmer v. Ohmer [C. C. A. 6] 238 Fed. 182, 193, 151 C. C. A. 258); and, notwithstanding the specific mention of the pug shaft in the first and third claims, we are of opinion that the inventor has intentionally limited claim 2, at least to the connection of the crank to the pug shaft upon the front end of the mill. Not only are the specifications and drawings generally consistent only with such limitation (the specification expressly states that the crank is journaled through sleeve on "the front end of the pug mill shaft"), but the very simplicity of the device (resulting in strength, smoothness and durability), which was its best claim to invention, included direct connection with the end of the pug shaft. Arnold testifies:

"I gained considerable simplicity in operation by connecting this plunger directly onto the pug shaft;" and "one of the important features, which I considered most broadly patentable at the time I filed my application, was the direct connection from the crank on the main shaft to the press on the inside. By the 'crank on the main shaft' I mean the main pug shaft."

Arnold may or may not have doubted the utility or patentability of his device, from the standpoint of simplicity, when not applied directly to main or pug shaft, but indirectly, through a countershaft. But, whatever his ideas upon this subject, it is enough that he limited himself as stated; he has no right to complain that his competitor has relied upon such obvious construction of the patent. In so saying, we do not overlook the rule that a generic claim may, in a proper case, be well supported by merely specific description and drawing (Paper Bag Patent Case, 210 U. S. 415, 418, 28 Sup. Ct. 748, 52 L. Ed. 1122), nor the other rule that an inventor need not, by his claim language, anticipate variations which are the substantial equivalent of his form, and that even express limitations found in a claim with reference to form or shape will not necessarily prevent the due application of the rule of equivalency (Western Electric Co. v. La Rue, 139 U. S. 601, 606, 11 Sup. Ct. 670, 35 L. Ed. 294; Hoyt v. Horne, 145 U. S. 302, 12 Sup. Ct. 922, 36 L. Ed. 713; McSherry Co. v. Dowagiac Co. [C. C. A. 6] 101 Fed. 716, 721, 41 C. C. A. 627; Metallic Extraction Co. v. Brown [C. C. A. 8] 104 Fed. 345, 353, 43 C. C. A. 568; Schieble Toy, etc., Co. v. Clark [C. C. A. 6] 217 Fed. 760, 133 C. C. A. 490); but we think these principles inapplicable to this case.

[3] In a broad sense, and for many purposes, the side of the charging chamber is the perfect equivalent of the end of that chamber. It may be that Arnold would have been entitled to a claim like claim 2 with "discharge face" substituted for "front end"; and if the use of the phrase "front end" indicated only Arnold's intent to name the location that happened to be the appropriate one in the machine before him for his platen and plunger mechanism, it might well be that the defendant's side location would be its equivalent. However, as we have pointed out, the front end location was not a matter of mere form. The degree of direct communication and of simplicity which Arnold thought to characterize his invention demanded that the location should be on that face through which the pug shaft projected; and when it thus appears that the word of limitation represented a thought essential to that which the inventor regarded as his new step, its limiting effect cannot be neutralized through the rule of equivalency. Houser v. Starr (C. C. A. 6) 203 Fed. 264, 269, 121 C. C. A. 462.

It is now said that Arnold's substantial step in advance was to receive upon his plunger all the side thrust or tendency to circular motion involved in a pitman or walking beam or rocker arm, and thus transmit to the platen rods only an absolutely vertical motion. If this is conceded, it appears that he undertook to express this inventive thought in the first claim, which ends with the clause ."whereby the said pitman drives the said plunger and platen rod vertically in unison." The first claim, however, includes a method of connection between crank and pitman, which method defendant does not use; and we cannot find in the second claim any attempt to state broadly the same inventive thought which Arnold undertook to cover by his first claim.

We therefore agree with the District Court that infringement is not shown.

As to claim 8, copied in the margin:[2] The idea of letting air into the press platen was not new. Brown, in 1851 (No. 8,269), showed a hole in the bottom of the pressing piston "closed by a valve opening downward for the purpose, when the piston rises, of allowing the air to pass through, and cause the clay to be detached, which would otherwise adhere by suction to the piston and resist its upward motion." Bisbee, in 1869, had shown a movable, perforated cap upon the lower side of the press plunger, whereby air was carried over the surface of the brick. Martin, in 1867, had shown pipes in the "follower," or press plunger, whereby the air enters as the "follower" is raised and escapes as the clay is pressed. There was, in our opinion, no invention in introducing the air through hollow plunger rods carried above the clay, nor in the use of the air valves employed.

The decree of the District Court is affirmed.

---

[2] "8. In a brick press of the type shown in combination with the press platen of a hollow plunger rod passing through the said platen, and a valve to close said hollow rod, substantially as described."