### SEIBERLING v. JOHN E. THROPP'S SONS CO. *

(Circuit Court of Appeals, Third Circuit. October 19, 1922. Rehearing Denied December 4, 1922.)

.No. 2862.

1. **Patents ⬛328—941,962, for tire-shoe making machine, held valid and infringed.**
    The State patent, No. 941,962, claims, 4–7, 12, 13, 22–26, for a pneumatic tire-shoe manufacturing machine, consisting of the combination of the core wheel, used in the hand process of manufacturing, rotated at a rapid speed, causing radial stretch of the fabric, with spinning rolls mounted on a moving platform and pressing and cementing the fabric, while stretched and puckerless, to the sides of the shoe, *held* a co-operating combination, and not a mere mechanical aggregation, to involve novelty, utility, and invention, and not anticipated; also *held* infringed.

2. **Patents ⬛26(1)—Test of combination is coacting of elements.**
    The general principle is that the earmark of a patented combination is the coacting of the elements to produce a unitary result.

3. **Patents ⬛155—Disclaimer held not to invalidate.**
    Where the essence of a patented tire-shoe manufacturing machine was the combination of a power-driven core, with spinning rolls, mounted on a radial, moving support, and so laterally pressed as to compel them to follow the lessening contour of the shoe down to the bead edge, a disclaimer withdrawing all claims embodying a tread roll, and limiting other

---

⬛For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

*Certiorari granted 260 U. S. ——, 43 Sup. Ct. 251, 67 L. Ed. ——.

claims to the operation of the elements on that part of the core outside the tread portion, and then only when driven at a sufficient high speed of rotation to operate as described, *held* not to invalidate the patent.

Davis, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the District of New Jersey; Joseph L. Bodine, Judge.

Suit by Frank A. Seiberling against the John E. Thropp's Sons Company. From a decree for defendant, plaintiff appeals. Decree vacated, and case remanded, with instructions.

Rogers, Kennedy & Campbell, of New York City (Robert Fletcher Rogers and Luther E. Morrison, both of New York City, and Roland S. Trogner, of Akron, Ohio, of counsel), for appellant.

Thomas G. Haight, of Jersey City, N. J., and E. Clarkson Seward, of New York City, for appellee.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

BUFFINGTON, Circuit Judge. In the court below, suit was brought by the owner of Patent No. 941,962, granted November 30, 1909, to Will C. State, for a pneumatic tire-shoe manufacturing machine. The suit charged infringement by the John E. Thropp Company of Claims 4, 5, 6, 7, 12, 13 and 22 to 26 inclusive.

As shown in its opinion, printed in the margin,[1] the court below conceived the case was substantially the same as that decided by the Circuit Court of Appeals of the Sixth Circuit, reported at 257 Fed. 74, 168 C. C. A. 286, and without itself entering into a discussion of the issues here involved, it in effect followed that case. As in our view the record presented in this case is substantially different from that before the Circuit Court of Appeals in the case cited, we are

---

[1] "This case involves letters patent 941,962 for a tire-making machine, granted November 30, 1907, upon the application of Will G. State, his interest assigned to the plaintiff. The bill also claims an infringement of patent 762,561, granted on the application of Messrs. Seiberling and Stevens. This patent has been withdrawn, and a decree is asked under the State patent alone.

"The plaintiff's patent was before the Circuit Court of Appeals for the Sixth Circuit in the case of Firestone Tire & Rubber Co. v. Seiberling, 257 Fed. 74, 168 C. C. A. 286. The claim is urged, however, that the record in the present case is so distinct from the record in that case that a different result is inevitable; the distinction being that, a disclaimer having been filed February 14, 1919, claims 1, 2, 3, 18, 19, 20, and 21 are not in suit, and claims 8, 9, 10, 11, 14, 15, 16, and 17 have been erased. The effect of the disclaimer is broadly to limit the patent to a combination in a tire-making machine of a forming or spinning roll with a high speed core. The method or process used is the same which the proofs showed had for many years prior to the patent been used in the making of tires by hand.

"The Circuit Court of Appeals for the Sixth Circuit considered the case as though before them in its present aspect. See 257 Fed. 82, 168 C. C. A. 294. If further authority is necessary, see Conroy v. Penn Electrical & Manufacturing Co. (C. C.) 155 Fed. 421, affirmed 159 Fed. 943, 87 C. C. A. 149. The result reached makes it unnecessary to pursue the many other grounds urged for the invalidity of the patent.

"The relief sought will be denied."

justified in placing of record a full statement of the issues here involved and our reasons for reversing the decree entered below.

[1] The case is important. It concerns the machine making of a pneumatic rubber shoe for an automobile tire, and a satisfactory tire is the measure of an automobile's efficiency. Such shoe is a built-up product, composed of successive layers of fabric cemented or plastered to each other. Leaving aside the tires made by a single stretch of fibrous material, and which were forced into place on the side of the shoe by what are known as "jigger fingers," and confining ourselves to shoes in which the material is stretched at different parts of the shoe in two directions at right angles to each other, and to a process of cementing or plastering them in place by a spinning roll, we note the fact that tires embodying these two features of double stretch and roll-spinning fastening were, before the patent to State here in question, hand made.

A statement of the old, hand-made art is so clearly set forth by Judge Denison in the opinion in the Sixth Circuit case, we copy his words:

"An annular metallic core having spokes and a hub was centrally mounted upon a shaft, so that it could revolve; the core thus resembling the rim or tire of a wheel. This core was approximately circular in cross-section, and its cross-section diameter, as well as its entire diameter through the hub from edge to edge of the rim, were proportioned according to the size of the casing to be made. The operator coated this core with an adhesive substance. He then took a strip of rubber-impregnated fabric, which would stretch out to be as long as the circumference of the core, and in width somewhat less than the circumference of the cross-section. As he revolved the core on its hub, he stretched and pasted this fabric strip upon the core, pressing and shaping it with his fingers or with hand tools, so that it adhered in all places and was without wrinkles. He repeated this operation as many times as there were to be fabric layers in the casing. The impregnating composition, having the character of rubber, would also attach each two layers of the fabric together. The strip of fabric was cut upon the bias, and the warp threads therefore ran from the inner open edge of the tube in a diagonal course along, across, and around the tube to the other open edge thereof; and the next layer of fabric put on was reversed, so that these warp threads crossed those of the first layer at a selected angle. Where the ends of the fabric met each other, they were overlapped enough to make a pasted joint. Each layer of fabric was first pressed down and attached by the hand of the operator on its central portion throughout its length, thus constituting the part of the casing corresponding to the tread. The degree of lateral curvature here is slight, and there would be no difficulty in making a smooth attachment; but, as it was continued around the remaining circumference of the cross-section, there would be an obvious tendency to gather and wrinkle. This wrinkling would be fatal to the strength of the casing, and it could be avoided only by careful manipulation and gradual shaping. The ultimately smooth and unwrinkled surface could be had by virtue of a quality which all woven material has had since weaving was known; i. e., that it will contract in one direction, as it stretches in another. When a fabric is stretched in one diagonal direction, its square meshes become diamond-shaped, with the length of the diamond along the line of stretch and its width at right angles. This produces a contraction of the fabric in the line of its width. In tire building, it is primarily the central part of the strip which is thus stretched longitudinally as it is attached to the tread of the core, leaving the side portions or wings projecting and free. Upon the same principle, if these side portions are then stretched laterally, they will shrink longitudinally, and, if this stretching is done in progressive measure as the edges are approached, the longitudinal shrinking will be

greatest at the edge. In this way, it results that the fabric may be shaped smoothly and without wrinkles to the entire side core surface."

With this picture distinctly in mind, it will be seen that in making such a shoe we have to deal with a series of nonuniform circumferences, viz. the longest circumference length at the outer or tread periphery of the core; at the two sides of the core the circumference length will be smaller; and as the inner or bead edge of the core is reached we have a still smaller circumference length. It is therefore apparent that, as there is a lessening of core circumference from the outer or tread circumference zone to the shorter zone of the side and the still shorter one at the bead edge, and as the unitary rectangular fibrous sheet to cover these zones is of uniform length, puckers or wrinkles in such fibrous material would necessarily be formed in these shorter circumferences, unless in some way the rectangular fabric of uniform length was shortened as it was cemented on these lesser core circumference zones. When the tread or outer periphery covering sheet was circumferentially stretched from normal, of course, as explained by Judge Denison, its square meshes became diamond-shaped, with the diamond in the line of circumference stretch. If this stretch was gradually diminished until the side zone of the core was reached, the diamond of the covering would correspondingly recede into the square of the normal form, and we would then have the normal unpuckered length of the fibrous material automatically taken care of at that point, and if, as the inner or bead edge of the shoe was reached, the fibrous material was stretched at right angles to the core, then its squares would take the form of radially pointed diamonds, and that would necessarily contract the length of the rectangular material. In other words, there was an initial stretch of the fabric from its normal squares into circumferential diamond-shape interstices. That made the tread portion of the tire.

There was a normal square of the material at the side of the shoe, and below that there was a radial stretch of the covering at the inner or bead edge of the shoe, which changed the square to a radial diamond-shaped interstice and correspondingly lessened the normal length of the fabric. As explained by Judge Denison, this was accomplished in the hand process by the operator, who "stretched and pasted this fabric strip upon the core, pressing and shaping it with his fingers or with hand tools, so that it adhered in all places and was without wrinkles." But the avoidance or elimination of wrinkles became more difficult as the zone of smaller circumference length was reached, and in that respect he said:

"Each layer of fabric was first pressed down and attached by the hand of the operator on the central portion throughout its length, thus constituting the part of the casing corresponding to the tread. The degree of lateral curvature here is slight, and there would be no difficulty in making a smooth attachment; but, as it was continued around the remaining circumference of the cross-section, there would be an obvious tendency to gather and wrinkle. This wrinkling would be fatal to the strength of the casing, and it could be avoided only by careful manipulation and gradual shaping."

This hand work required high skill and was physically hard on the operator. The core had to be actuated by one hand and the spinning

roll directed by the other. Where the different layers of fabric over-lapped, the roll was apt to jump. The initial speed of the core could not be maintained, unless one hand of the tire maker was employed in revolving it, and, if one hand was so employed, its nonuse on the spinning roll, of course, made the roll-jumping trouble more acute. Moreover. the variation in speed caused corresponding variation in the regularity and uniformity of the interstices of the fibrous ma-terial, and the output was limited to the strength and skill of the oper-ator. The evidence is that under the hand tool process the possible production was but a few tires per day; but, as its double stretch was regarded as most effective in securing tire strength, it was neverthe-less continued. Hence the effort to devise a way to manufacture tires by machine.

This was first attempted in a machine of wholly different type from the one here in question. That machine was the invention of Seiber-ling and Stevens, and was the leading subject-matter in the case in the Sixth Circuit. Seiberling and Stevens' plan was to use jigger fingers, but the proof is that their jigger-finger machine was not commercially successful and was commercially scrapped. In this state of the art, in 1907 State undertook to adapt the other or hand-roll method of making a double-stretched tire to machinery. Certain elements enter-ing into that problem were, of course, well known. The fact of the desirability of the initial circumferential stretch of the tread portion into circumferential diamonds was in use; the lessening of stretch, resulting in squares on the side of the shoe, was a well-known prac-tice, as was also the radial stretch for the inner portion of the shoe, which turned the square of the fabric into a diamond shape at right angles with the diamonds of the initial or tread stretch. So, also, the use of a hand or spinning roll was well known, and the problem in-volved, as in most machine improvements, was to take these well-un-derstood and recognized processes, which were done by hand and di-rected by skill, and do the same work by machinery. This problem State met, and for the first time successfully solved in a machine-made tire of the double stretch character indicated. The machine he pro-duced was at once recognized. It went into instant use. On such ma-chines millions of tires have been built, and large numbers of com-panies have taken out licenses under the patent.

In determining the inventive character of State's work, the first question involved is whether the successful machine first disclosed by him was a mere mechanical aggregation of separate well-known steps, or a co-operating combination. We note, first, that what we are here dealing with is a unitary product, namely, a completed, machine-made shoe tire for an automobile. We are not dealing with the making of the tread portion of a tire alone, and with its consequent necessary cir-cumferential stretch and the formation of circumferential diamond-shaped interstices in the fabric in such tread portion. We are not dealing with the making of the median zone of the shoe, with the inter-stices square and unstretched. Nor are we dealing with the making of a bead zone where the stretch is radial and the interstices are radially pointed diamond shaped. But we are concerned with the machine

making of a finished tire, in which there is a continuity of sustained, interrelated, and necessary co-operation, in which there is a progressive length nonuniformity and an angle change of stretch, in which there is a change of speed rotation at different stages, and in which every one of the separate operations of the machine is individually essential to the completion of the unitary product of the unitary machine.

Analyzing such machine, we note that in the tread circumference there is a low speed, and we there start with a circumferential stretch and a circumferential diamond-shaped interstice. Its separate process-es and their product do not end and are not completed at any given point, but as each distinct process and mode of operation begins and carries on it correspondingly modifies the product, and as the machine functions in its entirety there is a gradual and progressive change in the continuous operation and in the progressing and changing product, which gradually, uniformly, evenly, and continuously changes the product of the machine from the initial circumferential stretch and the circumferential headed diamond-shaped interstices into a gradual approach to the normal square with its substantially unstretched fabric into which the product gradually shapes itself up to the side or median line. But the process does not stop here, for there is still a continual shading, this time from the square of the median zone of the tire side into the radial circumferential stretch of the bead or inner portion of the tire, and a gradual departure from the unstretched square of the median line to the radially stretched and radially pointed diamond-shaped interstices of the bead or inner portion. Far from being separated, isolated zone processes, there is a gradual and uniform, and indeed an unbroken, spiral sequence caused by the rapid rotation of the core and the consequent exercise of centrifugal force on the covering material, by which it is automatically gradually stretched radially, and by the joint action of such centrifugal, radial stretch, and the spinning rolls, the square of the median zone progressively shades into the radial diamond-shaped interstices of the bead or inner zone of the shoe.

In a way we have anticipated what State's machine really is by thus describing its results. But such statement should be initially made, for the crux and dominating functional feature of State's machine is the use upon the fabric of a centrifugal force caused by rapid rotation, a process which is wholly different from the original hand process, and one which State, in the experiments which he carried along in the development of his machine, first found he could utilize. Briefly stated, his machine may be thus described: He took the old core wheel of the hand process, and used impregnated strips of fabric, and formed the outer or tread portion of the shoe, and cemented it to the core, just as had been done in the old hand process. He continued that process just as it had been in the hand process, down to the point where he plastered or cemented the fabric onto the core down to the median line point. But here he changed to something the old hand process had never used, namely, the machine was speeded up to a point where the revolution of the wheel and flying skirt of the uncemented loose fabric

stretched itself radially and formed thereby radial, diamond-shaped interstices, which contracted the normal length of the fabric.

At this point we note that State made use of a shifting platform, on which he mounted on each side of the tire spinning wheels or rolls so pressed inwardly by springs that, as the rolls revolved, they engaged and pushed inward and against the sides of the core the stretched flying skirts of the fabric. Thereby he then, and by the wheels, pressed and cemented the radially stretched and therefore puckerless fabric against the lessening sides of the shoe clear down to the bead edge. It will therefore be seen that the essence of his disclosure was the rapid, sustained, regular revolution of his core, the use of a shifting platform on which he located his spinning rolls, and the constant, regular, and uniform exertion of pressure upon those spinning rolls, causing them to automatically press the automatically stretched and loose fabric, or skirts, in an unwrinkled state, on the bead of the lower surface of the core.

If this statement of the process be correct, and there can be no doubt in that regard, it follows that the process is a unitary one, is a continuous one, is an interrelated one, is an undivided one, and that there is a continuity of uniform, sustained, progressive, advance from the start to the finish of this machine-made tire, which is brought about by the rapid revolution of the core wheel, acted upon by the spin of spring-controlled engaging rolls co-operating with the centrifugal force generated by the rapid motion of the core. In other words, united, co-operating, conjoint functioning of the core speed and spinning rolls, effected by roll springs and the shift of roll platform, all conjointly functioning to produce a unitary machine result which neither of them separately could effect. Such being the mechanical fact, who shall combat the patent deduction that these elements, brought together and assembled for the first time by State, stamp the combination as an inventive combination, and not as a mere mechanical aggregation of disjointed steps.

At no single stage of this machine's processes do we find a complete, separate, finished entity. Standing alone, the tread with its circumferential diamond-shaped interstices is nothing; the median or square portion with its normal square is nothing; the bead with its radial stretch and diamond-pointed interstices is nothing. It is when each co-operating element in combination with its fellows has done its individual, but still co-operating, work, we produce the unitary and finished product which State for the first time made by machinery, and which made such a great change in the tire art. Each element acts and has to coact with its fellows to produce the unitary result and make the unitary product which alone the machine was fashioned and devised to produce. And not only is this conclusion the inevitable sequence of a clear understanding of the process, but the question of aggregation and combination is strikingly solved and practically answered by a study of the evolutionary processes or stages by which through some 15 different steps the patentee gradually evolved in the tire-building art, the successful corelation and adaptation of well-known

hand operations to machine operations. The problem was one of great difficulty. It was not solved, even by a single inventive thought, or by its initial conception, but with the settled purpose in view of substituting machinery for hand work and automatic machine control for human skill.

[2] State went through a most unusual series of experiments, and as each one was made it disclosed some difficulty, which he had to overcome and did overcome step by step, until at last he evolved a structure which did by rapid machine work, and largely by automatic operation, what was previously solely and laboriously done by exhaustive hand work. That the result was novel is established by proof. That it was useful is shown by its prompt and general adoption, as well as by the vast aggregate of its product, and that it was inventive is demonstrated not only by its own facts, but is evidenced by the cases decided by many different judges in this industrial circuit, who have from time to time carefully followed a clear controlling principle in dealing with the question of aggregation or combination in machines. That general principle is that the earmark of combination is the coacting of the elements to produce a unitary result.

In the early case of Société v. Rehfuss (C. C.) 75 Fed. 657, Judge Acheson, in considering a machine where, during the continuous process operation of a pearl button cutting lathe, a sharpening wheel was brought into relation to the cutting tool, said:

"The several constituents co-operate in respect to the work to be done, each is essential to the complete organization, and the result is both new and highly useful."

The court was there dealing with pearl, a substance so hard that its cutting tool had to be sharpened, or, as Judge Acheson said:

"The extreme hardness of the material speedily dulls the edge, and constant resharpening of the tool is necessary. This occasioned much delay, when the old method of cutting pearl buttons was pursued. Moreover, the employment of highly skilled workmen to keep the tools properly sharpened was required."

It followed, therefore, that the suspension of the process while the tool was automatically sharpened was not an isolated operation, but a link in the chain of unbroken continuity, which made the machine a continuous operative combination leading to a unitary product.

In Burdett v. Elevator Co. (C. C.) 196 Fed. 43, affirmed in 197 Fed. 743, 117 C. C. A. 206, Judge McPherson said:

"The successive operation of the signals and of the motor is not a decisive objection. * * * nor need all its movements be simultaneous. The test is whether there is a new unitary result, to the production of which the different elements coact."

These cases were but following the earlier and leading case in this court, where in National Cash Register Co. v. American Cash Register Co., 53 Fed. 367, 3 C. C. A. 559, this court made the test the fact that each of the elements there involved, "by the co-operation of the others, capacitated to contribute, by acting in its own peculiar way, to the common end, which, without the co-operation of each and every

other of the co-ordinated elements, it would be powerless to accomplish or advance." This principle was further accentuated by this court in Novelty Glass Mfg. Co. v. Brookfield, 170 Fed. 948, 95 C. C. A. 516, where the machine for pressing glass insulators involved several successive steps, namely: (1) The gathering boy poured the molten glass into the machine mold; (2) the presser man brought the mold under the actuating rod, by a lever brought down the screw plunger, detached it, and left it seated in the molten glass; (3) by the mechanical revolution of the table, the mold passed to another workman, who by a rotary spindle unscrewed the plunger; (4) by another rotation of the table the mold passed to a fourth workman, who opened the same and took out the completed machine-molded insulator. All of these operations were themselves old mechanical processes, but no one had ever combined them to produce a machine-made insulator. But even in view of the fact that all the steps were separately old, and were thus in a measure isolated and unconnected, the court held there was a novel combination and use in a machine which produced a new unitary article, to wit, a machine-made insulator, in that regard saying:

"It is said, however, that the machine is a mere aggregation, the different parts which are brought together having no combined action, but simply operating in juxtaposition, each by itself as a complete and independent piece of mechanism, under the manual control of separate workmen. And this view is confirmed, as it is urged, by the way the claims are progressively built up, starting out with a certain number of elements and adding one at each step, even the stop or detent to lock the table, and the standard about which it turns, being utilized to that end. But whatever may be said of the attempt so made, of which more anon, the different parts in our judgment sufficiently co-operate to a common end to dispel any such idea. The test is whether there is a new unitary result, to the production of which the different elements co-act (Bliss v. Reed, 106 Fed. 314, 45 C. C. A. 304; National Tube Co. v. Aiken [C. C. A.] 163 Fed. 264), which certainly is the case. The purpose of the mechanism which is brought together is to make glass insulators, and this it most successfully and expeditiously does; a completed article being produced at a single turn. No doubt there are different steps in the operation to which the different parts are successively addressed. But it is not necessary that the insulators shall be made at a single stroke, in which each of the parts shall be involved. That may be desirable, and through the genius of some one, if the nature of the material permits, may possibly be attained. But for the present a machine which embodies and is adapted to carry out the process, as it is understood and supposedly has to be performed, in which there are distinct parts for the several steps, is not to be condemned as an aggregation on that account."

To our mind, none of these cases, the interjection of the tool sharpener in the cutting of the pearl button lathe, a mechanical interruption and segregation of the cutting process, but still one essential in the wear and tear of a tool cutter against the hardness of pearl; the signal and motor of the elevator; the successive and distinct stages of the glass insulator machine mold, present as clear a case of coacting, combining elements as the present one, the gist of which is the rapid rotation of the core and its resultant radial stretch, acted upon by the self-adjusting spinning rolls. To our mind, the combination in the present case is more marked because in it there is no isolation of stages, but related continuity of action in rapid rotation and co-ordinated roll

spinning, to produce the unitary result. As soon as rapid rotation begins, roll spinning also begins, and utilizes the rapid rotation to enable the rolls to plaster an unpuckered, radially distended diamond-shaped fabric upon the core. To our mind, there could be no clearer and more distinctive characteristic example of combination, afforded as the basis for a true combination claim, than is evidenced by the present machine. While in no sense were the elements of rapid rotation, varied stretch of fabric at different zones, spinning rolls and centrifugal force, as an abstract principle, new in themselves, we are satisfied that the utilization of centrifugal force to stretch the fabric and the action of the spinning rolls upon a centrifugally, automatically stretched fabric was an entirely new combination, which State brought into the tire art.

As we have said before, State's was the first successful machine in this country to make a double-stretched automobile tire by machinery. It is contended, however, that what he did was anticipated by the Belgian patent, No. 194,731, granted September 20, 1906, to Alphonse Matherne, for a machine and process for mechanically manufacturing casings for pneumatic tires. Without entering into minute details, it suffices to say that by certain mechanism Matherne proposed to unwind the fabric which is advanced to the core, and to stick or plaster it to the tread circumference, or, as the patent states:

"As the fabric is pulled along and unwound from the drum 18 it encounters the rollers 30 on the casing 28. * * * Each of these rods carries at its extremity a roller 30, which advances and retracts on the core, so as to stick to its straight or convex sides the fabric which has been placed there."

In addition to thus plastering the tread portion, and thereby lengthening the fabric along the line of the median circumference of the core, the outer or free edges of the fabric were lessened in length by a process of crimping, which is described in the patent as follows:

"The fabric on leaving the drum passes between two rolls that are spherical or oval in form and arranged in such a manner as to produce a slight lengthening of the middle of the fabric, which lengthening greatly facilitates the removal of the puckers. On the same, support there is mounted, at each side, two conical gears 36, the sole purpose of which is to produce a slight, uniform puckering of the fabric strips at their edges, insuring in advance a uniform contraction of the fabric at all points."

Now it will be observed that at this stage, while there is lengthening of the median line of the fabric by circumferentially stretching, there is no contraction of the outer edges by radial stretching. It is true the edge of the fabric has been crimped or puckered, but this puckering, while it has shortened the line by forming puckers, has not changed the square of the fabric into a radial diamond-shaped interstice, as is the case in State's machine. Moreover, this puckered edge or skirt was not left free as in State, but was plastered down by Matherne to the side of the core; in that regard the patent saying:

"The fabric is placed on the core, which is coated with a layer of rubber solution, so that the fabric adheres well to it and may be pulled along by its rotary movement."

To smooth out the designedly formed puckers or wrinkles on the cemented edge of the fabric, Matherne provides a forked tool, which

has a rounded roller set at an angle on a sliding tool carrier. The operation is thus described:

"On the support *17*, which constitutes a tool carrier, there is mounted a tool like that shown in Fig. 6, which has a fork with a rounded roller set at an angle. The sliding tool carrier *17* is adjusted so that the roller comes to the level of the top of the core. Then the machine is set in operation and the roller is caused to descend progressively on the side of the core and all the way down to its base. Thus there is obtained the complete and rapid removal from the fabric of the puckers, the descending motion being produced automatically by the pawl *34*. Both sides may be readily worked at the same time, by mounting two tools like that shown in Fig. 6, on the sliding tool carrier *17*. * * * This last device (the tool of Fig. 6) has a great advantage in being manually controlled, whereby it has the capacity of easily passing over the beads."

We cannot accede to the contention that Matherne's disclosure has the effect of destroying State's practically operated and highly successful machine. There is no evidence that the machine in the form disclosed by Matherne had any effect on the art. In point of fact, he suffered the patent to lapse in default of the first payment required after its issue, and when he subsequently obtained a German patent he abandoned his rollers and adopted another form of mechanism. But, wholly apart from these considerations, we feel that Matherne did not touch upon or solve the problem overcome by State. In the first place, he deliberately formed puckers and then sought to eliminate them, a procedure wholly different from State, who never formed puckers, and indeed prevented their formation by radial stretch and radial diamond-pointed interstices. Matherne plastered his puckers to the core without stretch, and thereafter sought to roll out the puckers. State, on the other hand, left the skirts of his fabric free, and stretched those fabric edges into radial diamond-shaped interstices, by the use of high-speed core rotation. Indeed, the whole process of Matherne, so far as the side and inside or bead zone of the fabric was concerned, was simply the use of a hand roller to iron out the puckers he had deliberately formed and plastered on the core. Had the art stopped with Matherne's proposed machine, the auto tire art would not have had the impetus brought about by State's disclosure.

[3] Seeing, then, that State's contribution to the tire-making machine art was novel and useful, that it passed into general use, and that its worth and the validity of his patent have been acquiesced in by large numbers of manufacturers in the automobile industry, who naturally would not pay tribute unless they were satisfied of the validity of his patent, we turn to the question whether such a meritorious patent is to be invalided as held by the court below, on account of the disclaimer State filed after the decision in the Sixth Circuit. We cannot give the disclaimer that effect.

Experience has shown that very often applicants for patents, impressed by the seeming importance of their own inventions, have made statements and claims which time and closer knowledge of the art show are unwarranted. In relief of such common mistakes, the disclaimer statutes allow a patentee to seasonably avow such unwarranted statements and unjustified claims, and to restrict and narrow his ap-

plication to the limits of the real, novel disclosure he made, and to confine his claims to that limit. Where a disclaimer is filed in good faith, and no attempt is made thereby to broaden or make more inclusive the original disclosure or claims, the law looks with favor on such procedure. In this case there is no element of fraud, bad faith, or an attempt to broaden the disclosure or claims, but an honest effort to eliminate from the specification and the construction of the claims all elements save those which constituted the true disclosure State gave the art.

Broadly speaking, the essence of State's invention consisted of the combination of a power-driven core, with spinning rolls mounted on a radial, moving support, the rolls being so laterally spring-pressed as to compel them to follow the lessening contour of the shoe down to the bead edge. The Circuit Court of Appeals of the Sixth Circuit had held that it was an aggregation to claim a *tread roll* in combination with the spinning rolls, and the disclaimer withdrew all claims embodying the tread roll, namely, 8, 9, 10, 11, and 14, and also claims 15, 16, and 17, which related to other subsidiary features not connected with those features which make up the essence of the patent. All of these claims disappeared from the patent and are not involved in this case, and such a course of procedure has the warrant of judicial approval. O'Reilly v. Morse, 15 How. 62, 14 L. Ed. 601; Sessions v. Romadka, 145 U. S. 41, 12 Sup. Ct. 799, 36 L. Ed. 609.

As to the claims which are here in suit, and which embody the essential elements of State's disclosure, there was no abandonment of them, but simply an assertion of and emphasis upon those vital elements which we have indicated. For example, take claim 22,[2] which embodies the elements of, first, a power-driven ring core; second, a radially moving support laterally power-pressed toward the core; and, third, a spinning roll mounted on a support for passing radially along the sides of the tire-shoe, to shape the sheet of fabric on the core. The effect of the disclaimer is to restrict the operation of these elements to that part of the ring core beyond the tread portion. In that respect, the disclaimer states that in respect to claim 22:

"I hereby disclaim any combination of the recited elements *except when* constructed and co-ordinated for shaping and applying a previously unshaped sheet fabric strip to that part of the recited ring core beyond the tread portion, *and unless* the power drive for the ring core functions by a sufficiently high speed of rotation and consequent centrifugal force to throw the unapplied fabric portion out from the side of the ring core, while the recited spinning roll in its radial movement, and while pressed toward the ring core, functions by a gradual action upon such centrifugally thrown-out fabric to shape it to the side of the rotating ring core while bringing it into adhesive contact therewith."

The question of infringement is confined to a narrow limit. The essential elements of State's machine are found in the defendant's machine. We have the rapid rotation of the core. We have the loose

---

[2] "22. An open tire-shoe making machine comprising the combination of a sheet-fabric supply, a power-driven ring core, a radially moving support laterally power-pressed toward the core, and a spinning roll mounted on the support for passing radially along the sides of the tire-shoe to shape the sheeted fabric on the core, substantially as described."

edges, stretched by the centrifugal force induced by rapid core rotation. We have a radially moving tool support, and those tools laterally power-pressed, not by the spring of State's machine, but by a weight which functions in the same way to bring the spinning rolls into one continuous shifting play, and the whole machine devised to adapt and combine, in the same mechanical way State disclosed, the use of spinning rolls, co-operating with centrifugal radial stretch of the fabric to produce the unitary machine-made product, which State first made possible in the art.

We are therefore of opinion the court below committed error in the entry of its decree, that its decree should be vacated, and the case remanded, with instructions to enter a decree finding the claims here involved valid and infringed, and directing an accounting.

DAVIS, Circuit Judge (dissenting). I regret that I am constrained to dissent from the conclusions of my colleagues. The Circuit Court of Appeals for the Sixth Circuit found that the patent in question disclosed a mere aggregation, and not a patentable combination. Firestone Tire & Rubber Co. v. Seiberling, 257 Fed. 74, 168 C. C. A. 286. In view of the fact that Seiberling really presented his case on the theory that State discovered a new method of making tire casings or a new set of functions to be performed by associated mechanism, the court did not rest its decision upon invalidity, based upon aggregation, but held that he had nothing "broadly new either in his method or in his selected tools." Thereupon Seiberling, the assignee, filed a disclaimer, in which he stated that he had reason to believe that through inadvertence, accident, or mistake the specification and claims of the letters patent were in part too broad, including that of which State was not the first inventor, but what reason he had, or what the inadvertence, accident, or mistake was, or which of these, that caused the patentee to claim more than that of which he was the first inventor, he does not state.

Claim 22, which may be used as typical, is for a "tire-shoe making machine comprising in combination" (1) a sheet-fabric supply; (2) a power-driven ring core; (3) a radially moving support laterally power-pressed toward the core; and (4) a spinning roll mounted on the support at a receding angle to the plane of the core for passing radially along the sides of the tire-shoe to shape the sheet fabric on the core. The claim is for a machine pure and simple. The purpose of the patent was to do by machine what had before been done by hand, and for such a machine a patent may be granted. Penn Electrical & Manufacturing Co. v. Conroy, 159 Fed. 943, 87 C. C. A. 149. The function of the elements is stated, but there is not a word in any claim of the patent about the method of operation of any element. Seiberling disclaimed entirely claims 8, 9, 10, 11, 14, 15, 16, and 17, on the ground that they contained that of which State was not the first inventor. Claim 8 for instance, contained a machine comprising (1) a sheet fabric supply; (2) a power-driven ring core; (3) a radially movable tread-forming roll for shaping the outer portion of the tire; (4) a radially moving support laterally spring-pressed against the core; and

(5) a spinning roll mounted on the support to pass radially along the sides of the tire-shoe to shape the sheeted fabric on the core. In this claim, which is admittedly too broad and contains that of which State was not the first inventor, there are the identical elements comprising claims 4 and 22, which represent the two groups of claims of the patent. In other words, the claims unqualifiedly disclaimed contain the substance of those not disclaimed. Seiberling has put himself in the inconsistent position of disclaiming in one claim the identical thing which he claims in another, on the ground that State did not invent the former but did invent the latter. Again, the part retained is not "definitely distinguishable from the parts claimed without right." They are the same thing.

The elements remaining after the disclaimer was filed are not only a new combination, but they are invested with a distinct method of operation not claimed in the old combination. This method of operation, prescribed by the disclaimer, is a distinct addition to the claims, expressly made to avoid the effect of the opinion of the Circuit Court of Appeals of the Sixth Circuit and the disclosures of the Belgian patent (first discovered by the patentee during this litigation), No. 194,731, issued to Matherne November 20, 1906. Seiberling disclaimed any—

"combination of the recited elements, except when *constructed* and *co-ordinated* for shaping and supplying the previously unshaped sheet fabric strip and unless the power drive for the ring core functions by a sufficiently high speed of rotation and consequent centrifugal force to throw the unapplied fabric portion out from the side of the ring core, while the recited spinning roll in its radial movement and while pressed toward the ring core, functions by a gradual action upon such centrifugally thrown out fabric to shape it to the side of the rotating core."

He thus tried to avoid the conclusion that his machine was a mere "aggregation," and endeavored to reconstruct and co-ordinate the elements of the new combination, so as to have them coact and conjointly produce the result claimed for the machine. The effect of the disclaimer is to retain in part the machine patent and add to it a method of operation. To this extent the character of the patent is changed to a method patent. The disclaimer is a virtual restatement of the claims, changing their character from a simple machine to a new combination machine, whose elements operate according to a prescribed method. This may not be done by a disclaimer. Enameled Metals Co. v. Western Conduit Co., et al. (C. C. A.) 269 Fed. 620; Hailes v. Albany Stove Co., 123 U. S. 582, 587, 8 Sup. Ct. 262, 31 L. Ed. 284. If claims may be changed, so that a combination of elements constituting a simple machine may be modified and formed into a new combination, and the elements given a prescribed mode of operation by a disclaimer, it is difficult to know what function a reissue performs. This suit may not be maintained by virtue of section 4922 of the Revised Statutes (Comp. St. § 9468).

The disclaimer invalidates the patent, and the decree dismissing the bill, in my opinion, should be affirmed.