## SANDS MFG. CO. v. SMITH.

### No. 5671.

Circuit Court of Appeals, Sixth Circuit.

Nov. 6, 1931.

J. F. Oberlin, of Cleveland, Ohio (Geo. B. Pitts, of Cleveland, Ohio, on the brief), for appellant.

M. B. May, of Boston, Mass. (Herbert A. Baker, of Boston, Mass., and Hull, Brock & West, of Cleveland, Ohio, on the brief), for appellee.

Before MOORMAN, HICKS and HICKENLOOPER, Circuit Judges.

HICKS, Circuit Judge.

Suit by appellee, Charles H. Smith, against appellant, the Sands Manufacturing Company, for infringement of letters patent No. 1,238,825, to Ross, assignor, September 4, 1917, for "Means for Preventing Boiler Explosions, Leakage, etc."; No. 1,388,-383, to Smith, August 23, 1921, for "Temperature-Controlled Safety Relief-Valves for Hot Water Boilers"; and No. 1,401,002, to Smith, December 20, 1921, for "Safety Relief-Valves for Hot Water Systems."

Appellant set up the defenses of (1) lack of invention; (2) anticipation by prior patents and publications; and (3) noninfringement. The court decreed that claims 1 and 2 of the Ross patent, claims 1, 4, 5, 6, and 7 of the first Smith patent, and claim 2 of the second Smith patent were valid and infringed. These are the only claims here involved.

These patents relate to devices for preventing explosions in such hot water containers as the ordinary kitchen storage tank. Usually such tanks are supplied with water from an overhead tank by the gravity system or from city mains by the high pressure system. In either case, the water en-

ters the storage tank, flows thence through the heater—usually a kitchen range or gas burner—thence into the tank and by pipes to any required point in the building. The effect of water pressure in city mains is well known. If excessive it tends to rupture the pipes or tanks at their weakest points, usually at the joints or connections, but such pressure (the water being unheated) has no inherent explosive energy. To protect against damage the familiar pressure relief-valve is ordinarily used but this type of valve is not designed to forestall boiler explosions. It is common knowledge that water unconfined at sea level generates steam at 212° F. The specifications of both Smith patents proceed upon the proposition that water in a storage tank under pressure from the main may be heated to a temperature much higher than 212° F. without conversion into steam. The theory is that it is not unusual for the pressure in the main to exceed the vapor pressure in the tank, and in that event the temperature of the water may be raised proportionately higher than 212° F. before boiling. In this connection Smith presents a "pressure table" indicating the energy discharged by an explosion of a thirty-gallon tank of hot water under different temperatures and pressures. As an illustration, he demonstrates or claims to demonstrate, that such a tank of water under main pressure of ten pounds will not boil until it reaches a temperature of 239.5° F., and if it explodes at 239.5° F. it will release 479,800 foot pounds of energy; and that under a main pressure of ninety pounds a similar tank of water will not boil until it reaches a temperature of 331.2° F. and if it explodes at that temperature it will discharge 3,138,400 foot pounds of energy, etc. His theory is that if under such circumstances the least seam or fissure develops in the system and the pressure is thus suddenly released the water at such high temperature will immediately flash and expand into steam with tremendous force. Before Smith, Ross, without indulging in any causal theory, assumed that hot water boilers will explode. We may accept the fact and be justified in assuming that Smith has discovered the cause, or at least one of the causes, but we do not regard such discovery, which Smith did not and could not patent, as particularly relevant. DeForest Radio Co. v. Gen. Elec. Co., 283 U. S. 664, 685, 51 S. Ct. 563, 75 L. Ed. 1339.

Our problem is, whether the claims in suit denote invention. We do not think they do.

First, as to claims 1 and 2 of Ross patent No. 1,238,825:

Claim 1 is printed.[1]

To safeguard boilers and hot water tanks Ross adopted a simple arrangement. He located a fusible plug in one of the hot water pipes of the boiler or tank with one side in direct contact with the water in the pipe. While the water was being heated its rising temperature would fuse the alloy of the plug before the explosion point was reached, and the pressure would be relieved by the escape of the water provided for by a drain pipe connection with the pipe at the plug. But drain pipes and fusible plugs were both old as applied to boilers and tanks. The composition of alloy is a mere matter of skill. The specifications of the Ross patent expressly recognize that fusible plugs used to prevent explosions in steam boilers were old. This is so well understood that it is unnecessary to cite the prior art. Fusible plugs located in steam boilers in contact with the hot water and melted by steam when the water is low were old. Lovekin No. 1,248,143—1917; Robes & Chapman No. 112,283—1871; Bullard No. 660,358—1900; Bickford No. 685,244—1901; Lovekin No. 1,166,531—1916; see, also, Altman No. 766,576—1904; Palmer No. 689,512—1901, and No. 752,099—1904. Fusible plugs designed to be melted by hot water or other fluids were also old. See Lovekin patents, supra.

The claimed advance of Ross over the prior art is that he places the fusible plug "in constant, direct contact with the hot water exterior to the boiler and adapted to be fused by excess temperature of the hot water with which it is in direct contact," and uses an alloy of such low melting point that the plug will fuse at water temperatures rather than under the heat of the fire box (as in plugs in the crown sheet of locomotives), or at the temperature of superheated steam, as was apparently contemplated by Gregory, British patent No. 10,339 (1895),

[1] "1. In combination, a boiler having a circulation pipe exterior to the boiler, a heater interposed in said pipe, a hot water outlet pipe leading from said boiler and in communication with said circulation pipe, said pipes together constituting hot water piping, and a fusible plug located exterior to the shell or wall of the boiler and in said hot water piping and constantly exposed at one side to and in constant, direct contact with the hot water exterior to the boiler and adapted to be fused by excess temperature of the hot water with which it is in direct contact, and a pipe leading from said plug and in communication beyond said plug with the outer air, thereby to relieve boiler pressure upon fusing of said plug, said plug being normally exposed to the outer air."

Palmer, United States patent No. 752,099, Altman, United States patent No. 766,576, and others. While the device so constructed and positioned may evidence the exercise of some inventive thought, a patent may not issue save to the first inventor; and in the patents to Lovekin, supra, we find these same fusible plugs, in constant contact with the water of the boiler, and adapted to fuse at predetermined water temperatures and thus prevent the overheating of the water which, according to Lovekin, inevitably weakens the heater and not infrequently causes the boiler or other hot water containing chamber of the heater to burst. This is complete anticipation in respect of the inventive step, if any. Obviously, no invention is required to substitute an alarm system operated by escaping steam (see Ross No. 1,238,825) as was shown in patent to Altman No. 766,576, or an opening to permit the escape of the water and thereby decrease temperature by the influx of fresh water, for the closing of a valve and the shut-off of the heat supply, as provided by Lovekin. Such substitution was easily within the skill of a mechanic familiar with the art.

■ Second, as to claims 1, 4, 5, 6, and 7 of No. 1,388,383, the first Smith patent:

We do not think these claims stand in any more favorable light than Ross. Claims 1 and 5 are printed.[2]

Smith selected an ordinary pressure valve having the usual threaded inlet and outlet, the usual chamber and valve proper or stem held against the valve seat by a threaded cap and spring. He hollowed the valve stem axially from its lower end where it joined the seat to a point opposite the outlet, where he opened a port through the side of the stem. He then joined the lower end of the hollow valve stem to a tube located longitudinally with the stem, and at the opposite end of the tube he inserted a fusible plug. He screwed this device into the top of the tank, where the water was hottest, so that the plug was washed by the water in the boiler and thus arranged, if the plug fused, the water had a direct outlet through the tube, the hollow valve stem, the port, the chamber and the valve outlet. Its escape was as uninterrupted as in Ross. Although Smith thus evolved a unitary structure, he did no more than bring together two separate and distinct devices—(1) the ordinary pressure valve; and (2) the temperature valve or fusible plug of Ross.

The specifications of the first Smith patent minutely describe such pressure valve and its operation and the specifications of the Ross patent teach that the fusible plug may be located in the outer wall of the boiler substantially as in Smith. In Smith just as in Ross one side of the plug is in direct contact with the water and is adapted to be fused by the water, and in both devices a free outlet is provided for the escape of the water. In Smith the temperature and pressure valves have a common element, i. e., the outlet, but this produces no new or combined operation any more than the joint handle for a pencil and an eraser (Reckendorfer v. Faber, 92 U. S. 347, 356, 23 L. Ed. 719), or the power shaft and rotating means in Grinnell Washing Machine Co. v. Johnson, 247 U. S. 426, 38 S. Ct. 547, 62 L. Ed. 1196. There is no joint operation between the temperature plug and the pressure valve. They were not designed to coact. Smith presupposed that one might fail, and he intended the other as alternative. In fact, as an emergency proposition, he had still another safeguard consisting of a fusible washer within the flange of the valve stem where it connects with the valve seat. There is no new result such as is indicated in the illustrations in Reckendorfer v. Faber, supra, page 357 of 92 U. S., and in Weir Frog Co. v. Porter (C. C. A.) 206 F. 670, 675. Both the pressure valve and temperature valve of Smith act just as each had ordinarily acted prior to Smith. He may have produced a more attractive and salable device, but it was not invention. Concrete Appliances Co. v. Gomery, 269 U. S. 177, 184, 46 S. Ct. 42, 70 L. Ed. 222; Grinnell Wash. Mach. Co. v. Johnson Co. supra; Hendy v. Miners' Iron Works, 127 U. S. 370, 375,

[2] "1. A temperature-controlled relief valve adapted for use in hot-water systems, comprising a body or casing having a lateral threaded outlet nipple, a threaded inlet nipple, at one end, and a threaded removable cap at the other end, in combination with a relief member normally closing said inlet to the entrance of water and having a tube projecting through said nipple and a plug of fusible material sealing the end of said tube, said parts being arranged and related whereby, when the inlet nipple is screwed into a hot-water container, the plugged end of the tube will project into the hot water therein, and whereby, on removing said cap, said member and tube may be removed without detaching said body or casing from said hot-water container.

"5. A temperature-controlled relief valve comprising a body having an outlet and an inlet, with a valve seat interposed therebetween, a valve associated with said seat to cut off the flow of water into said body, a spring normally holding said valve against its seat, a pipe connected to and movable with said valve and extending through said seat, and a plug of fusible material closing said pipe, said valve having a passage leading from said pipe to the interior of said body, whereby, when said plug is melted, water may pass through said pipe and valve into and out from said body."

8 S. Ct. 1275, 32 L. Ed. 207; Pickering v. McCullough, 104 U. S. 310, 317, 26 L. Ed. 749; Hailes v. Van Wormer, 87 U. S. (20 Wall.) 353, 371, 22 L. Ed. 241; Huebner-Toledo Breweries Co. v. Matthews Gravity Carrier Co., 253 F. 435, 446 (C. C. A. 6); Herman v. Youngstown Car Mfg. Co., 191 F. 579, 586 (C. C. A. 6); Excelsior Steel Furnace Co. v. Williamson Heater Co., 286 F. 131, 133 (C. C. A. 6).

Our view is strengthened by the British patent No. 10,339—1895, to Gregory. This patent was for a combination safety valve and fusible plug designed for the prevention of explosions in kitchen boilers. Gregory used an ordinary spring safety valve as did Smith. Instead of joining it to a tube closed with a fusible plug Gregory located the plug in the valve proper and inserted the device into the boiler as did Smith, as a safeguard, if the pressure valve should fail. Gregory's plug did not necessarily extend into the water, and was designed to fuse from the heat or steam in the boiler when the water ran short. These are the essential respects in which Gregory differs from Smith, and in view of Gregory and Ross, and what was before known, we do not think Smith's structure evidences more than mechanical skill.

■ As to claim 2 of the second Smith patent, No. 1,401,002:

The claim is printed.[3]

This was intended as an improvement upon the first Smith patent. It consists of extending the wall of the inlet and inserting therein a second fusible plug beneath the valve seat. The inside of this plug was in direct contact with the water as in the first Smith patent and in Ross. The plug had no reciprocal relation with the temperature valve or plug of the first Smith patent or the pressure valve thereof. It was located as an emergency proposition, and if it fused an unobstructed flow of the water to the outside was provided just as in Ross.

and the first Smith patent. It exhibits nothing more than mechanical skill.

But proceeding upon the postulate that all of the claims involved are valid, in view of the state of the prior art they must, we think, be limited to a very narrow range of equivalents, and as so limited we are unable to say that appellant has trespassed except as hereinafter indicated. We do not think that claims 1 and 2 of Ross are infringed by the manufacture and sale of either appellant's first or second device. These devices were made to be screwed into the hot water container so that the fusible plug would project into the water, whereas the fusible plug in claims 1 and 2 of Ross is specifically located entirely outside of the shell or drum of the boiler and in the hot water piping. This view makes it unnecessary to discuss the question whether contributory infringement was properly alleged or was proved.

We do not doubt that appellant's first valve would infringe the claims of the first Smith patent. In our view, the Smith claims read unequivocally thereon. The manufacture and sale of this device, however, was discontinued by appellant within about four months after it was placed upon the market. We do not think appellant's second structure infringes any of the Smith patent claims involved. This structure of appellant departs from the Smith claims involved in the following particulars, among others, to wit: The tube therein cannot be removed by removing the cap; there is no passage way through the valve; there is no pipe or tube connected to the valve, movable with it, and closed at one end by a fusible plug; there is no port through the wall of the valve stem. Appellant's second device departs from claim 2 of the second Smith patent, No. 1,401,002, in that its pressure valve does not control the outlet of water from one end of a tube which has an opening through its side closed by a fusible plug. In other words, the principal characteristic of the Smith patent, i. e., the unitary arrangement, is in all substantial respects lacking in appellee's structure.

Reversed.

---

[3] "2. A device of the class described comprising a tube in communication with water in a tank, a pressure valve controlling the outlet from one end of said tube, and a fusible plug closing an opening through the side of said tube."