## KELLEY–KOETT MFG. CO. v. McEUEN.
### No. 8874.

Circuit Court of Appeals, Sixth Circuit.
May 11, 1942.

See, also, D.C., 38 F.Supp. 596.

Dean S. Edmonds, of New York City, and Walter F. Murray, of Cincinnati, Ohio (Murray, Sackhoff & Paddack and Walter F. Murray, all of Cincinnati, Ohio, on the brief), for appellant.

Arlon V. Cushman and John W. Malley, both of Washington, D. C. (Allen & Allen, of Cincinnati, Ohio, Arlon V. Cushman and John W. Malley, both of Washington, D. C., and C. D. Towers, of Jacksonville, Fla., on the brief), for appellee.

Before HICKS, HAMILTON, and McALLISTER, Circuit Judges.

HICKS, Circuit Judge.

Suit by Harry B. McEuen, appellee, against The Kelley-Koett Manufacturing Company, appellant, for infringement of Claims 4, 6, 7, 12, 13 and 14 of Patent No. 2,040,441, for X-ray apparatus, issued May 12, 1936. In the same action appellee sued for breach of confidential relations in using disclosures of improvements, now covered by Patent No. 2,040,441, and in using disclosures of improvements described in patent application No. 702,989, which it was alleged appellant had induced appellee to make to it; and sought an injunction and an accounting, and exemplary damages.

Appellant pleaded invalidity and non-infringement of the patent and denied that it had induced appellee to disclose to it in confidence any improvements, or that it had ever adopted, used or wrongfully appropriated any information disclosed to it in confidence.

■ The District Court decreed that the claims were valid and infringed and that the Company had taken advantage of the relationship of trust and confidence as to improvements incorporated in the patent; and issued an injunction restraining the use of machines embodying the claims, and ordered an accounting for profits and damages by reason of the infringement and for damages arising from the breach of trust and confidence, including the damages resulting from the Company's acts and conduct before the date of the issue of the patent, and ordered the Master to recommend general damages sufficient to make plaintiff whole. The court made no reference to patent application No. 702,989 in the findings of fact, conclusions of law or decree. We cannot review this omission, for even if appellee had perfected a cross-appeal, the whole record is not before us. Portions of it only are preserved. Defendant alone appealed limiting the questions before us to those of validity and infringement of Patent No. 2,040,441, and to those arising from the alleged breach of trust with reference to improvements covered by it.

### The Patent Case.

The subject matter of the patent related to alleged improvements in X-ray apparatus with particular application to cooling problems arising from the use of higher voltages in deep therapy machines.

The X-ray machines, in more or less conventional use in 1930 when appellee's application was made, included an X-ray or vacuum tube, into which was fitted at one end a hollow anode stem upon which was molded a button of some refractory metal to provide the target or focal spot, and at the other a common type cathode. The electrons were hurled at great speed across the highly evacuated space between the cathode and the target, and the bombardment while engendering much heat, developed only a small quantity of X-rays. Several witnesses testified that over 90% of the electrical energy used was converted into heat.

Hence, where it became desirable in deep therapy work, as contrasted with superficial work such as skin treatments, to subject the patient to a higher dosage of X-rays for a short period rather than to a small dosage over a long period, it became necessary to use higher voltages. But the increased voltages increased the heat and to avoid injury to the tube and to the patient and operative, it became essential to dissipate this heat.

Moreover, uncontrolled X-rays can be very harmful, and it became accepted practice well before 1930 to enclose the tube completely in a hermetically sealed cylin-

drical casing having a layer of metal impermeable to X-rays, such as lead, with an aperture for their escape and use under the control of an operator. This casing not only protected the patient and operator from stray radiation but also protected against damages and injuries arising from fracture of the tube.

Appellee, a practicing physician, has specialized in radiology since 1917. In 1921 he purchased a "so-called deep therapy machine" which was restricted to low voltage through the tube, because the only provision for cooling it was the drawing of cool air through the casing around the X-ray tube. This, he testified, "limited the *imput*" (sic) "of current * * * because if we went beyond a certain point that target would become overheated and volatilized and" (would) "melt and ruin the tube."

Efforts have been made to cool the tube by circulating liquids through the hollow anode back of the target where they absorbed some of its heat and were then piped in conduits to the outside of the casing and to external cooling coils or radiators. Some machines used water as the cooling fluid but water is a conductor of electricity and there was danger that a person would come in contact with the charged water or the piping through which it flowed.

Other machines used a dielectric oil for cooling. The oil was a non-conductor and was customarily treated with some such substance as carbon tetrachloride to render it noninflammable. But, since the anode was a conductor of electricity, if the conduit which carried the circulating oil to it was of conductive material, it would still carry a dangerous electrical charge outside the casing despite the nonconductive character of the oil.

To meet this danger, appellee, using dielectric oil as the cooling medium, placed insulating sections in the circulation tubing. These sections were installed inside the casing and passed therethrough and connected outside with the ordinary circulation pipes leading to the cooling unit. The lower ends of these sections terminated near the X-ray tube and were joined by flexible couplings with tubes sealed into the anode which provided the inlet and outlet, respectively, for the cooling medium to and from the anode.

This was appellee's "main" invention, as disclosed in the patent and delineated in the claims. As stated in his brief, the essence of the invention lay in "having the X-ray tube within a surrounding casing, an external cooling unit, and circulating conduits for dielectric oil leading from the external cooling unit to and through the casing and to and from the anode of the X-ray tube, the portions of the conduits between the casing and the X-ray tube being at least in part of insulating material, so that they in combination with dielectric oil cooling fluid, *block off the high potential of the anode at the source of danger.*"

Any high potential from the anode, which in other systems would have been carried outside the casing to point of danger to human beings by means of the cooling medium or its piping, would, in appellee's device, be stopped within the casing, since it could not pass through the oil nor along the non-conducting pipe sections. Thus, appellee was able to provide "all the advantages of the external cooling unit, such as convenience of adjusting a small casing containing the X-ray tube with respect to the patient, while at the same time completely eliminating at the source the danger of shock."

There is an "incidental" feature of appellee's alleged invention, the object of which is "a less strained" functioning of the X-ray tube. This feature was incorporated because the great heat generated when the tube was in use sometimes fractured it. This fracturing was caused in some measure by expansion of the tube against the rigidly mounted circulating piping. To obviate this, appellee provided flexible connections between the insulating sections and the sections mounted into the anode to allow some slight movement.

It is obvious from the specification and from the wording of Claims 4 and 13 that the only object of these flexible connections was, as stated in Claim 4, "to permit independent movement of the tube under expansion and contraction without interfering with the oil circulation"; and, as stated in Claim 13, "to permit independent expansion and contraction of the X-ray tube. * * *" The District Court so indicated in its finding of fact No. 8. The flexible connections have no interaction with the insulating sections, which have a totally independent functioning. These separate functions do not modify each other. The flexible connections and the insulating sections operate independently of each other and each performs its own work in its own way. No new result was achieved by combining these two elements

in the same claim. It was the purest aggregation and we think Claims 4 and 13, in which both features are present, are invalid. Reckendorfer v. Faber, 92 U.S. 347, 356, 23 L.Ed. 719; Sands Mfg. Co. v. Smith, 6 Cir., 53 F.2d 459; Firestone Tire & Rubber Co. v. Seiberling, 6 Cir., 257 F. 74.

We copy Claim 13,[1] which is typical.

Although not technically so worded, we think in the other four claims in suit the flexible feature existed as one element of a combination into which the allegedly novel insulating feature was introduced, and therefore in determining the validity of these four claims we consider the prior art. Claim 14 is typical.[2]

Elements of the combination have long been found in the prior art. As early as 1902, German Patent No. 12,829 disclosed a liquid cooled target, using oil as the cooling medium.

▮ A French article, 1924, described a simplification of a water cooled X-ray tube. Appellant insists that one paragraph is very significant. It is, "We have been able to simplify this" (Coolidge & Moore) "structure by replacing water with an insulating fluid,—oil, for example. In this case the two tubes of the anode are connected to the pump and to the oil reservoir, either by tubes of special insulating material, similar to rubber, but unaffected by oil, or by rigid pipes of insulating material, such as ebonite, bakelite, etc." Apparently this article was not discovered until shortly before the trial. It described a tube built for a laboratory experiment. No casing was described and no drawing accompanied this part of the article. We do not think that the article meets the firmly established rule "that an earlier foreign language publication must be clear and explicit in the extreme. " Permutit Co. v. Wadham, 6 Cir., 13 F.2d 454, 455.

By 1930 machines using casings and liquid with water cooling systems external thereto were in ordinary use. Morrison, No. 1,656,826, January 17, 1928, which provided an insulated cooling system "enclosed within a corona-proof shielding." The anode was cooled by water circulating in an independent system rather than by water flowing directly from the water mains as was possible in lower voltage systems. In Morrison the heated water from the anode circulated in its own piping through a tank of liquid dielectric, which was in turn cooled by tap water or perhaps by a fan or refrigerator. Thus the water at anode potential was insulated by the oil from the water at ground potential.

Although Morrison says in his specification that his invention is not limited to water circulating through the anode, it seems clear from another paragraph that he does not use insulated ducts to convey the heated liquid, since he states that the assembly leading up to the anode forms a "continuous circulating system at high potential." The "insulated duct" referred to in the claims appears from the drawing to be a container for the circulating ducts, which as he states, are at high potential.

Smith, No. 1,896,206, February 7, 1933, describes a cooling system using a fluid dielectric in thermal contact with the anode. Metallic circulating conduits are used, but with insulating sections of "solid dielectric material such as bakelite" inserted between the anode and the pump in the outlet pipe, and between the anode and the cooling tank, in the inlet pipe. The drawing does not show a casing but it is pointed out in the specification that the drawing is purely schematic and appellant contends that if a casing were drawn around the tube it would include the insulating sections. We doubt this. In the first place, the insulating sections are massive in construction and many times the diameter of the conduit sections on

---

[1] "13. In an X-ray apparatus, a casing, a tube therein including an anode, circulating tubes leading from a source of dielectric oil beyond the casing to and through the casing and to and from the anode, said tubes having flexible sections to permit independent expansion and contraction of the X-ray tube and insulating sections to prevent the high potential of the X-ray tube from charging the casing and parts of the circulatory system beyond the casing."

[2] "14. In an X-ray apparatus, a casing,

an X-ray tube therein including an anode, a source of dielectric oil beyond the casing, tubes leading from said source through and being fixedly supported by the casing and to and within the anode for circulating the dielectric oil within the anode, said tubes in the lengths between the anode and casing being of insulating material and of flexible connection with the anode, whereby to insulate the casing and source of dielectric oil beyond the casing from the high potential of the anode."

either side. In the second place, the insulating section between the anode and the tank is so placed that the casing to include it would have encompassed the pump and cooling tank also. Smith's stated object was merely to protect the circulating apparatus from the high potential of the anode rather than to confine the high potential within the casing.

These are the most pertinent references in the prior art. Relatively minor changes in either would have produced appellee's result but those changes had not been made. The art was complicated and its contributions to human welfare went hand in hand with its inherent dangers. Accepted practices for confining the X-rays, cooling the tubes, controlling the currents, which were comparatively simple at low voltages, were met by new and intricate problems as higher voltages began to be used. The use of tap water had to be abandoned. Coronal emanations began to appear. Tubes melted or were fractured. New problems of insulation arose. Different cooling media presented different problems of insulation, pumping, flowage, etc. We think that appellee's contribution to safety in view of the meagerness of the prior art, was something more than an obvious step and we think that he made a contribution to the safe operation of high voltage tubes and is entitled to Claims 6, 7, 12 and 14.

Two machines manufactured by appellant are alleged to infringe, namely, the No. 12 Tube Stand and the Superay 400. Appellant makes the point that the No. 12 Tube Stand does not infringe because it has nc equivalent of that element in the patent claims, permitting expansion of the X-ray tube. We cannot concur. The No. 12 Tube Stand is exemplified in certain photographs, in Exhibits A and B, Trade Bulletin No. 34, and in a patent to Graves, No. 2,110,764. The Tube of the No. 12 Tube Stand was mounted on a standard within a casing comprising two end shells or "hoods" and a connecting cylindrical sleeve. It had an external cooling system. The casing was highly adjustable, being designed for raising and lowering on the standard, for oscillation on its short axis and for rotation on its long axis. The oil tubes of insulating material were rigidly fastened within the anode shield, being run through a guide of synthetic resin material securely attached to the inner wall of the housing. "From this guide, two rigid synthetic resin tubes * * * extend to the anode of the X-ray so that they can respectively convey cooling oil of high dielectric strength to and from the hollow anode of the X-ray tube." The specification and figure 7 of the Graves patent, however, disclose that the two synthetic resin tubes were connected with the anode end of the X-ray tube by leads of flexible, spirally wound copper tubing.

Appellant contends, and there was testimony to that effect, that the flexibility of the copper tubes connecting the bakelite sections of the oil conduits was to allow for the rotation of the tube to various positions relative to the patient. All this may be true, but this copper tubing constituted also a flexible connection with the oil tubes and took care of whatever expansion or contraction was incidental to the tube itself; and appellant's answer to the interrogatories is evidence that there was some expansion and contraction. In this respect appellant's No. 12 Tube Stand infringed the valid claims of appellee's patent. The fact that the flexible connections possessed the additional function of permitting the rotation of the tube, does not negative infringement. Cleveland Automatic Mach. Co. v. National Acme Co., 6 Cir., 52 F.2d 769, 772.

The Superay 400 was of imposing arch construction, in which the oil-immersed transformers were disposed in massive columns supporting the casing and tube. It had an external cooling system with oil as the cooling medium. Inside the casing and in the oil circulating system were bakelite insulating sections. In the "Supplement to the Interrogatories" it was stated that these bakelite tubes were tightly fastened to the upper part of the trough or casing and that these were "joined by means of unions to copper tubes which were semi-circular and are sealed into the X-ray tube as to their other end."

The nature and function of these copper oil connections are critical in resolving the question of infringement. The copper tubes in addition to being part of the oil line were also the electrical conductors to the anode. This added function, as we have seen in the discussion of the No. 12 Tube Stand, would not negative infringement.

William M. Lee, co-inventor of the Superay 400, testified that the X-ray tube therein could not expand in the direction of these copper connections, because the tube was clamped at that end in a tube clamp, that this tube being of pyrex glass, there was

no need for making allowance for its expansion and it was mounted rigidly in its bearings. However, on cross-examination Lee admitted that these copper oil connections would expand and contract with temperature changes and that, assuming that the X-ray tube would expand and contract under heat, these connections would take up any movement there might be.

It seems to follow logically from this testimony that although in the Superay 400 assembly these copper connections had no flexing function, they nevertheless were flexible to a degree and clearly read upon McEuen.

### Confidential Relationship Case.

Appellee was a practicing Roentgenologist. He was not a manufacturer nor even a draftsman. He had evolved certain ideas for the improvement of X-ray apparatus but he was dependent on others for their realization. Early in 1929 he employed one Hans Heether to make drawings from rough sketches preliminary to a patent application. The application followed on February 15, 1930.

Two years later, May 9, 1932, but four years before his patent issued, appellee initiated correspondence with appellant. Appellee wrote W. S. Werner, then Vice-President (later President) of appellant, inquiring if appellant wished "to help develop a new type of tube and apparatus for Deep X-ray Therapy" for which he had a patent application.

It may be inferred from the letter that appellee and Werner had previously known each other but there is no indication that at this time or for some time to come these men were on terms of intimacy "much less in the relationship of trust and confidence."

Appellant had been "Creators, Designers and Manufacturers of high-grade X-ray equipment since 1900"; and it was consistent, we think, with "arms length" dealing that Werner's reply, May 18, to this initial letter was that his company was interested and that he should suggest to appellee that he "send us such information as you may have at hand so that we may investigate possibilities and then give you a definite answer on the subject."

Appellee had already taken the initiative and there is no evidence that appellant "induced" appellee to make his disclosures as averred in the bill. Although we do not think this is a fatal variance [Standard Oil Co. v. Brown, 218 U.S. 78, 30 S.Ct. 669, 54 L.Ed. 939] the condition of the pleadings may throw into relief the relationship between the parties.

Appellee's next letter was dated May 20, 1932, and was addressed simply to Kelley-Koett Mfg. Co., Inc., with the salutation, "Gentlemen" and concluded "With kindest regards to all." There is no reference in it to Werner's letter of May 18. We think this general salutation and the complete omission of reference to Werner's letter of the 18th very curious, despite the fact that appellee testified that it was sent as a response to Werner's letter. It was unusual that appellee's letter, which with descriptive matter, blueprints and comment therein was a complete disclosure of the invention of the patent, made no reference to Werner's request to send the information. We think there is a well-founded inference that the transmittal of this data was a voluntary act on appellee's part and that it was sent before Werner's letter reached him, and that appellee, due to the long period of time elapsing, was most likely mistaken in his testimony to the contrary. The last paragraph significantly states that appellee was not in a financial position to undertake the development but in the event the "Company wished to enter into it" a royalty agreement might be arranged for the production of the tube and apparatus.

Werner replied on June 8 that the design appeared to have "considerable merit." His letter continued with some observations upon the possibilities of producing appellee's tube which Werner asked to be treated as "strictly confidential."

The next important letter was written by appellee on November 22, 1933, and was addressed to Mr. Geise, then President, and to Werner. Appellee wrote:

"I am very desirous of getting you to build this apparatus and tube for me and have not as yet considered anyone else in the matter and do not intend to expose the filing papers to any one as yet as I feel that I have the goods in this application and don't propose to let it out.

"I do though wish the tube and apparatus built and I know of no one I had rather have build it" (than) "the K-K and the only way I can now see that it might be built is by having an agreement with you whereby you will agree not to attempt to use any feature of the apparatus or tube in mode of application, means of assembling or

manufacturing any part or parcel of either tube or apparatus or in any other way try to circumvent my right under this filing or subsequent filings pertaining to the apparatus or tube and also that you will agree not to expose any of the features to any one whatever. I now have two filings on the apparatus and tube and may have to seperate the tube and apparatus into five or more seperate filings, this latter depending upon action of the patent office in classification.

"If you build the apparatus and tube for me it will be understood that you will have the opportunity of purchasing the rights to build such tube and apparatus as covered in patents first of all or to build such apparatus and tube on a percentage of the sale price coming to me as a royalty. * * *"

On December 4 Geise replied in part as follows:

"Your letter of November 22nd was received in due time. I would like to suggest that you submit the details of the proposition to us, first protecting yourself with regard to proper witnesses to the drawings and specifications you may submit (unless of course you have actually filed application on everything you will submit).

"It is quite contrary to our policies to use the ideas of another without their permission and you can therefore feel safe about the features outlined in your letter relating to this."

The first paragraph clearly warned that disclosures should be protected even though the Company was not in the habit of appropriating ideas without permission.

It is clear to us that up to this time, even though appellant had been in possession of appellee's disclosures for a year and a half, no confidential relationship existed whether the original disclosure followed Werner's request or whether appellee volunteered it.

Subsequent relationship between appellee and Werner has no particular bearing. The two became friends. Werner visited in appellee's home and became helpfully interested in the project of appellee for establishing a deep therapy X-ray clinic. He contributed ideas for the building and its equipment and even agreed to supply equipment at a heavy discount. He unearthed a possible source of donations for the project. Appellee sent a copy of his application on February 21, 1934, which was about the time work on the No. 12 Tube Stand was started. There was one long letter from Werner regarding the

extreme difficulties of developing workable tubes and apparatus.

As his various applications approached issue, appellee became more concerned about royalties and this is reflected in his letters. Werner sometimes met these inquiries with the statement that appellant's patent attorney would investigate and report. In one letter dated April 12, 1934, Werner said that they would take an exclusive license on mutually profitable items and a non-exclusive license on others, and in one letter he said something about an automatic 5% royalty on patents that should issue. But all this was directed to the formulation of their relationship following the issuance of the patents and has no particular bearing here.

After the patent issued on May 12, 1936, appellant's attorney submitted it to the usual examination, citing several earlier patents and disclosures in the art. The upshot of it was that appellant offered $2500.00 and equipment for rights under the patent, as against appellee's demand for a large cash settlement with royalties.

On the question of breach of confidential relations, the following three paragraphs from appellee's letter of July 31, 1936, are revealing:

"I therefore as sole owner of United States Patent No. 2,040,441 dated May 12th 1936 hereby forbid your company further use of the principles covered by it in the manufacture of the Theron 200,000 volt X-ray therapy machine or in any other machine now being constructed upon your factory floor. This includes your 400,000 volt therapy job which is now being assembled. This statement must not be interpreted to read as if I had given you permission at any time to use these principles, as I have not done so.

"These machines referred to in the above paragraph now under construction or in transit for installment must not be delivered or completed until after a settlement has been reached.

* * * * *

"You have had from me the description of the above mentioned patent a long time before the production of your first Theron and have been aware of the fact that the principles you are now infringing upon were allowed me by claims allowed over three years ago but I think you first realized the scope of this patent in Memphis, Tenn., where we met at the

meeting of The Radiological Society in December 1934 at which time I read to you several claims that had recently been allowed me and you will probably recall that you told me at that time that as soon as the patent was granted you would take a license out under it."

Portions of two paragraphs from Werner's reply indicate that the No. 12 Tube Stand was developed independently in 1933 and that his first examination of the application was in February 1934. This may be true as to his knowledge of the application, but the disclosure was, as we have noted, made much earlier.

There was testimony by Mr. Geise that the No. 12 Tube Stand which came out in April 1934 was developed by Mr. Graves and that the work was done under the supervision of Mr. Werner. Graves testified that he worked under Werner's supervision but denied that he had seen appellee's drawings. Mr. Lee, who designed the Superay 400, which was started in February 1936, testified that it was done with Werner's approval. Werner in the meantime had died.

The court evidently disbelieved the testimony that the developments incorporated into the infringing machines were arrived at independently. The court saw and heard the witnesses and we are not disposed to upset its conclusions.

We find in the record no trickery or cajolery upon the part of appellant. If color of trust and confidence can be read into the freely communicative relationship of appellee and Werner, from which appellee himself derived much information and counsel as well as tangible benefit, we think the requirements of equity will be met by charging appellant with the same royalties or profits for machines manufactured before the patent issued as after. This is the measure of damages indicated in Hoeltke v. Kemp, 4 Cir., 80 F.2d 912, a case in which disclosure was made prior to patenting. See also Booth v. Stutz Motor Car Co., 7 Cir., 56 F.2d 962.

We find on the record no justifiable basis for Section 11 of the decree directing the Master to recommend what amount of damages should be assessed over and above profits or reasonable royalties. Werner's friendly intercourse with appellee may have been indiscreet in view of his obligation to his company, but as to appellee, it was not so disarming as to outrage good conscience or justify punitive damages.

The decree is modified by holding Section 11 to be erroneous and Claims 4 and 13 to be invalid. With these modifications, the decree is affirmed.