## HUSZAR v. CINCINNATI CHEMICAL WORKS, Inc.

### No. 10675.

United States Court of Appeals
Sixth Circuit.

Feb. 3, 1949.

8

Floyd H. Crews, of New York City (Gatch, Kleinman, Roberts & Kuhn, of Cincinnati, Ohio, Darby & Darby and Floyd H. Crews, all of New York City and A. Harry Crowell, of Washington, D. C., on the brief), for appellant.

Frank Zugelter, of Cincinnati, Ohio (Frank Zugelter, James R. Clark, and Clark & Robinson, all of Cincinnati, Ohio, on the brief), for appellee.

Before SIMONS, ALLEN, and MILLER, Circuit Judges.

SIMONS, Circuit Judge.

The controversy was begun by an action of the appellee for a declaratory judgment seeking to have its rights determined as against the appellant's claims for infringement of three patents covering what is known as a rod mill. The appellant counterclaimed, seeking a declaration of validity for his patents, damages for past and restraint of future infringement. The patents are Huszar 2,367,585, 2,393,245 and 2,394,453, granted respectively January 16, 1945, January 1, 1946 and February 4, 1946. All of them were granted upon divisional applications stemming from an original application, serial No. 424,839, filed December 29, 1941. A decree was entered for the appellee adjudging its mills to be free from any and every claim of the appellant.

We were, at the outset, somewhat concerned about the failure of the district judge to make separate and detailed findings of fact. It would have been better to have done so and our study of the record would have been simplified had we had such findings. An examination of the decree, however, discloses findings of ultimate facts which, upon careful consideration of the record, obviously adjudicate the controlling issues. The court therein declares the several patents invalid because mills of the construction therein shown had been in public use for more than one year before the filing of the application upon which the patents issued; that they are invalid because of fraud of the appellant in executing affidavits to the effect that the disclosed devices had not been in public use for more than one year prior to the filing of the patent applications, and because the alleged inventions were the joint and composite product of various persons so that the appellant was not their sole creator or originator. We think, in view of Rule 52 of the Federal Rules of Civil Procedure, 28 U.S.C.A., that we are justified in considering the appeal without remanding the case for more specific findings and so to save delay in adjudication. United States v. Esnault-Pelterie, 303 U.S. 26, 58 S.Ct. 412, 82 L. Ed. 625; Hazeltine v. Crosley, 6 Cir., 130 F.2d 344; Refrigeration Engineering v. York Corp., 9 Cir., 168 F.2d 896.

The appellee for many years had been using grinding and mixing machines for pulverizing and mixing substances used in the manufacture of its product which comprised a revolving drum within which balls or metal bars effected pulverization. In one or more of its mills the grinding chamber was provided with means whereby partly ground material might be accumulated and returned to the grinding chamber for mixing. Mills of this type were concededly old in the art. Sometime in early 1938 the appellee decided to provide itself with additional equipment that would be an improvement upon existing mills, having in mind that a mill might be designed not only for selective return of partially pulverized material into the mixing chamber but also for the discharge of the mixture from the drum during its continued rotation. In 1938 Crane, an assistant engineer of the appellee, was consulted by his chief, Brunskill, as to the feasibility of such unloading device. Crane studied the literature of the art and undertook to make a crude model, in the construction of which he received advice from various persons in the appellee's employ. The original plan was to build a model with openings on the surface of the cylinder which would discharge the material,

and some kind of tube to convey it from the inside to an axial position. He wasn't a good enough mechanic for that purpose but did manage to arrange four discharge chambers with baffle plates and a cylindrical pipe, and when the model was tried out with salt and with dextrin it operated. The model was demonstrated to the executives of the appellee and to others, including the appellant. These facts are supported by substantial and cumulative evidence.

The appellant was a draftsman for the appellee. Sometime in July of 1938 he was directed to make drawings for a large scale mill embodying the features of the Crane model. Such drawings were made during August and September, parts for the construction of the model were ordered by the appellant or at his direction, the mill was built, installed and put into operation and proved to be so satisfactory that a number of similar mills were subsequently built, the drawings for all of them being made by the appellant. During all of this time there was no assertion by the appellant that he had made a patentable invention, either during the drafting period or prior thereto; no assertion that he had previously worked out computations for such a mill or had reduced to practice ideas of his own by means of a model, or that the building and operation of the several mills in any manner invaded any right possessed by him. The first intimation that any of the appellee's executives received that the appellant conceived he had invented something, was in 1945 when Washington patent counsel charged the appellee with infringement of the Huszar patents.

Upon issue of the first patent in suit the appellant's attorney communicated with the plaintiff demanding compensation and requesting a conference. The appellant advised the appellee's assistant manager, Brunskill, that according to his computations the appellee had saved at least one-half cent per pound in the production of its dyes by means of the new mills from the time the first mill was put in operation on September 29, 1938, and that the appellant thought he should have one-half to two-thirds of such savings, computed by

him to have been upwards of $250,000. Three weeks later, without any further communication to the appellant, the latter was served with the complaint in the cause and immediately discharged. It was not until the trial of the case that the appellee learned that the appellant claimed he had been making studies for the improvement of mills as early as 1934, and that in 1936 he had perfected a working model, the elements of which and their co-operation formed the basis of his designs for the mills built by the appellee and for the patent application subsequently filed in 1941 and the divisional applications filed later at the instance of the patent office. Until it was demonstrated at the trial, the existence of the model was unknown either to the executive officers of the appellee or its engineers. There is corroboration of the appellant's evidence that he had built the model in 1936, although there are some curious contradictions in the story developed by the record with which we are not now concerned.

The principal issue, as we see it, is whether there was a public use of the alleged inventions more than one year prior to the filing of the original application by the appellant on December 29, 1941. That the first mill had gone into operation on September 29, 1938, is not in dispute. It is indeed proclaimed and asserted to infringe claims of each patent. Two other mills went into operation in 1939 and a fourth in January, 1940. Their product, as well as the product of other mills put into operation in 1940 and 1943, was shipped from the appellee's plant to its sales agencies.

The appellant's challenge to the finding of public use is based upon a number of grounds. The first is that public use is an affirmative defense which must be pleaded, in reliance upon Electric Storage Battery Co. v. Shimadzu, 307 U.S. 5, 59 S.Ct. 675, 83 L.Ed. 1071, and that here there is neither pleading nor proof of such use. Affirmative defenses are required to be pleaded to prevent surprise. Here the installation and operation of the alleged infringing mills are asserted by the appellant. They are necessary elements to his case and his claim for damages. Neither the principal enunciated nor the de-

cision reached in the cited reference controls present circumstances. Next, it is contended that the charge of public use is based entirely upon a secret use of the machine in the appellee's plant with no evidence whatever that any product produced by the machine ever went into commerce. Denial is made by the appellee that the machines were used secretly. Many persons, other than employees in the plant, were permitted freely to go through the factory and observe the operations of the mills. The contention that there is no evidence that the product produced went into commerce comes with little persuasiveness from an appellant basing his claim for damages upon savings in the cost of manufacture. If the product was not sold there was no saving and no damage. The evidence that the machines were used openly and publicly was obviously credited by the court in arriving at its ultimate finding of the fact of public use, and we are unable to say that such finding is clearly erroneous.

It has been held that the use of an invention which is merely experimental is not a public use. It is neither claimed nor proved that the first mill designed by the appellant and built for the appellee was in any sense experimental. This must be so in view of the appellant's repeated assertions that he had completed his invention in 1936. There was no doubt in his mind but that it was satisfactory and useful and could be made in the ordinary size mill. It has at times been thought that a use is not public if, from an examination of the product, neither the process nor the machine by which the product was made could be understood by the art and contribute to its development. All this is now water over the dam. In the meticulous study made by Judge Learned Hand in Metallizing Engineering Co., Inc. v. Kenyon Bearing & Auto Parts Co., Inc., 2 Cir., 153 F.2d 516, the course of adjudication is charted from the early days to the present, and the conclusion soundly reached that the inventor's right to a patent is conditioned upon refraining from exploiting his discovery competitively after the invention is ready for patenting; that while the statute allows him a limited period (now reduced to one year) to give him time to prepare an application, if he goes beyond that period of probation he forfeits his right regardless of how little the public may have learned about the invention. We agree with this conclusion and our own decisions, notably Macbeth-Evans Glass Co. v. Gen. Elec. Co., 6 Cir., 246 F. 695, support it. We agree that it is the fiat of the Congress that it is part of the consideration for a patent that the public shall, as soon as possible, begin to enjoy its disclosure.

It is contended that if there was a public use of the machine it was not so used by the patentee. This, however, begs the question. The appellant designed the machine, ordered the parts for it, measurably supervised its building, and according to his own evidence made notes for a considerable period as to its manner of operation and volume of product,—and this without protest or any assertion of right. Of this there can be no dispute from the present record. If there was a public use of the machine it must be imputed to both appellant and appellee.

While we are content to say that the decree must be affirmed upon the finding of a public use beyond the permissible limit of the statute, we cannot refrain from the observation that even if it had been established that the use was secret the appellant still must fail. If the mills designed by the appellant, in respect to their installation and operation, had been maintained in secrecy for a substantial period, no valid patent could subsequently be granted upon them for, as we observed in A. O. Smith Corp. v. Petroleum Iron Works, 6 Cir., 73 F.2d 531, 537, "the right to secrecy and to patent monopoly are inconsistent, and that both cannot be asserted with respect to the same process [or machine]." This is a well recognized principle and is based upon the ground that an inventor may not extend his monopoly beyond the statutory period by keeping his invention secret. Compare Metallizing Eng. Co. v. Kenyon, supra; Macbeth-Evans Glass Co. v. Gen. Elec. Co., supra.

Nor is the principle of unjust enrichment applicable to the circumstances

of this case. It is an essential element of the doctrine that an appropriation of another's ideas must knowingly or wrongfully have been made. In Matarese v. Moore-McCormack Lines, 158 F.2d 631, at page 634, 170 A.L.R. 440, it was said by Judge Clark: "The doctrine is applicable to a situation where, as here, the product of an inventor's brain is knowingly received and used by another to his own great benefit without compensating the inventor." The assumption made in Bristol v. Equitable Life Assur. Soc., 132 N.Y. 264, 267, 30 N.E. 506, 28 Am.St.Rep. 568, a leading case on the subject, is that the appropriation must have been wrongful. The appellant in our case was directed by his employers to make drawings of a mill according to the principles partly, and perhaps even crudely, developed by its engineers. It then became his duty to use all reasonable skill in the making of such designs and in directing construction according to his drawings. Nowhere in the record is there a particle of evidence that the appellant at any time claimed he possessed a patentable idea or one that he had reduced to practice, or had incorporated in his drawings. Certainly the doctrine of unjust enrichment does not comprehend that one may induce another unknowingly to exploit an inventive concept without giving him an opportunity to negotiate a contract for its use, or exercise volition as to whether or not to accept its benefits, and then, after knowledge of the claimed invention had been kept from him by silence or artifice, hold him liable for substantial damages because of appropriation. There is not a particle of evidence to support an inference that the building or use of the designed machines was in any respect wrongful or invaded any right known by the appellee to be possessed or claimed by the appellant. We find nothing in Kelley-Koett Mfg. Co. v. McEuen, 6 Cir., 130 F.2d 488, to conflict with the view here expressed.

There was substantial evidence that the mill designed by the appellant, if it constituted a patentable invention, was not his sole creation because others contributed to it. This evidence was credible and was undoubtedly credited by the court, otherwise there could have been no finding in that respect. We are unable to say that such finding was clearly erroneous. We think, however, that the finding of fraud was unwarranted. It is an established and salutary principle that fraud is never to be presumed but must be proved by clear and convincing evidence. There must have been an intention to deceive and the mere fact that the appellant swore to affidavits that there had been no public use of his invention for more than one year prior to his application, does not seem to us to be enough to establish such intent when it is clear that the question of whether or not there has been a public use in varied circumstances is one that for many years has troubled the courts with no unanimity of decision thereon, and where, as here, the affiant is not a lawyer. There may have been, and the proofs do not clearly gainsay it, an honest belief that the use to which the alleged invention had been put was not technically a public use within the sense of the statute. The conclusions we have arrived at upon the more important issues make it unnecessary to consider the patentable nature of the asserted inventions, nor the fact of their infringement. Neither have we any need to adjudicate minor and collateral controversies disclosed by the record and argued in the briefs.

The finding of fraud will be eliminated from the decree and, as so amended,

The decree is affirmed.